

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TRACY DONELL HOLLAND,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

**FILED**
JAN 2 2 2004
~~ ~~ OFFICE
Clerk U. S. District Court
Greensboro, N. C.

1:02CV00395

## MEMORANDUM OPINION

**SHARP, Magistrate Judge**

This matter arising under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2401(b), and 2671-80, came before the Court on December 9, 2003 for a bench trial on the limited issue of Defendant's statute of limitations defense.[1] Plaintiff Tracy Donell Holland testified on his own behalf, and Defendant United States of America called as witnesses Plaintiff's wife (Melissa Holland), and two of Plaintiff's medical providers, Jacqueline W. Adkins, F.N.P., and Dr. Gregory H. Botz. At the close of trial, the Court took the matter under consideration and requested further briefing by the parties of certain legal issues raised by the evidence. The Court has considered all of the trial evidence and the final briefs of the parties, and now enters this Memorandum Opinion.

### Findings of Fact

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact:

---

[1] The parties have consented to the trial jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c).

1.      On June 16, 1998, Plaintiff Holland underwent arthroscopic right knee surgery for a service-related injury at the Durham Veterans Administration Medical Center ("VA"). (Trial Transcript, hereinafter "Tr.," at 5-6, 9-10.)

2.      Dr. Gregory H. Botz, a board certified anesthesiologist and VA physician, provided the anesthesia care, which included both general anesthesia and a regional nerve block. Dr. James Gould, a senior resident physician, assisted Dr. Botz. (Tr. at 133-34, 141-42, 144-46.)

3.      On June 16, 1998, immediately following the surgery, Plaintiff became concerned that he could not move his right leg. Plaintiff informed the attending nurse of his concerns, and she told him the nerve block was causing his symptoms. (Tr. at 41.)

4.      On June 22, 1998, Plaintiff visited the emergency room due to continued inability to move his right leg. The doctor told Plaintiff that his inability to move his right leg and numbness were not normal and that Plaintiff should be concerned. (Def.'s Ex. K-1 at 180; Tr. at 44-46.)[2]

5.      At a medical evaluation on June 26, 1998, a VA doctor asked Plaintiff to extend his right knee and Plaintiff could not do so. The doctor seemed surprised and returned with two or three other VA doctors. The doctors told Plaintiff that his inability to move his right leg and the pain and numbness may have been caused by either the nerve block or the tourniquet used during his knee surgery. (Tr. at 52-53.)

6.      On June 29, 1998, Dr. Richard Tim, a VA neurologist, performed a nerve conduction study and electromyogram ("EMG") on Plaintiff's right leg which indicated that Plaintiff had sustained nerve damage to his right femoral and saphenous nerves. The nerve conduction tests

---

[2] The Court will refer to the exhibits contained within Defendant's "Trial Notebook Book 1" as "Def.'s Ex. x-1" and the exhibits contained within Defendant's "Trial Notebook Book 2" as "Def.'s Ex. x-2."

resulted in audible results, and Plaintiff heard for himself the signals that showed damaged nerve connections. (Def.'s Ex. K-1 at 191-92; Tr. at 60-61.)

7.       On July 10, 1998, Plaintiff met with VA neurologist Dr. Tim Heine who concluded that Plaintiff's nerve deficits were consistent with a bruised nerve resulting from either the nerve block or the tourniquet. Dr. Heine told Plaintiff that if he did not experience any improvement over the next four to eight weeks, then Plaintiff might have a permanent neuropathy. (Def.'s Ex. K-1 at 201-02; Def.'s Ex. L-2, Timothy Allen Heine Dep. at 19-20.)

8.       On July 22, 1998, Plaintiff met with Jacqueline W. Adkins, F.N.P., of Piedmont Internal Medicine, Inc., and expressed an interest in obtaining a second opinion regarding his knee problems. (Def.'s Ex. E-1.)

9.       In early September, 1998, Plaintiff met with attorney Robert Morrison in Danville, Virginia. (Tr. at 67.) Attorney Morrison practices medical malpractice law. (Def.'s Ex. E-2, George D. Henning, M.D. Dep. at 8.) Plaintiff told his wife that he believed something had "been done wrong" in the surgery and he wanted to see about a claim against the hospital. (Def.'s Ex. H-2, Melissa Holland Dep. at 33-34, 36-37, 82; Tr. at 117-19.)

10.      Attorney Morrison referred Plaintiff to orthopedic surgeon George Henning in Roanoke, Virginia. Dr. Henning is not affiliated with the VA in any manner. (Henning Dep. at 6-7.)

11.      Dr. Henning examined Plaintiff on September 16, 1998 and concluded that Plaintiff had suffered an injury which probably represented a tourniquet palsy. Dr. Henning also concluded that Plaintiff's tourniquet time of 88 minutes was longer than average for arthroscopic surgery. Dr. Henning recommended new nerve conduction studies and sent a copy of his report to attorney Morrison. (Def.'s Ex. G-1.)

Case 1:02-cv-00395-PTS   Document 32   Filed 01/22/04   Page 3 of 9

12.     Pursuant to Dr. Henning's referral, Plaintiff saw Dr. Victor Owusu-Yaw, a neurologist in Danville, Virginia, on September 30, 1998. Dr. Owusu-Yaw is not affiliated with the VA in any manner. (Def.'s Ex. I-2, Victor Owusu-Yaw Dep. at 19; Def.'s Ex. F-1.)

13.     Dr. Owusu-Yaw noted in his medical report that Plaintiff "was especially concerned that he had not been told much about what was going on at the VA medical center." (Def.'s Ex. F-1.) Dr. Owusu-Yaw informed Plaintiff that he had a right femoral nerve injury from the regional anesthetic used during Plaintiff's right knee surgery. *Id.*

14.     From the time of Plaintiff's surgery on June 16, 1998 until at least April 20, 1999, Plaintiff received periodic assurances from his treating VA medical providers that his nerve damage was temporary and was expected to resolve with time and treatment. (Def.'s Ex. K-1 at 201-02, 261-62; Pleading No. 22, Pl.'s Tr. Brief, Tracy Holland Dep. at 107-09, 112, 162, 169, 175.)

15.     On April 17, 2001, Plaintiff filed his tort claim under the FTCA with the VA. (Pleading No. 24, Joint Stipulation of Fact.)

16.     After six months had passed without a decision by the VA on his claim, Plaintiff filed the instant lawsuit on March 20, 2002.

## Discussion

"A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after the claim accrues . . .." 28 U.S.C. § 2401(b)(2003); *Doe v. United States*, 280 F. Supp. 2d 459, 463 (M.D.N.C. 2003)(Osteen, J.). This time limit is jurisdictional and nonwaivable. *Gould v. United States Dep't of Health & Human Servs.*, 905 F.2d 738, 741 (4th Cir. 1990)(en banc).

-4-

The general rule under the FTCA is "that a tort claim accrues at the time of the plaintiff's injury . . . ." *United States v. Kubrick*, 444 U.S. 111, 120 (1979). In medical malpractice cases, where neither the injury nor its cause may be immediately apparent, the Supreme Court has adopted the "discovery rule" or "inquiry notice" standard. The Court held in *Kubrick* that a medical malpractice claim accrues within the meaning of section 2401(b) when the plaintiff knows, or in the exercise of due diligence should have known, of both the existence and the cause of his injury. *Id.* at 122-25 & n.7; *Gould*, 905 F.2d at 742. For a claim to accrue under *Kubrick*, a plaintiff need not know that the cause of injury was the result of negligence, nor the precise medical reason for the injury, nor the federal status of the doctors involved, nor have a legal understanding of the nature of the claim. *Kubrick*, 444 U.S. at 122-25; *Kerstetter v. United States*, 57 F.3d 362, 364 (4th Cir. 1995); *Gould*, 905 F.2d at 742; *Lekas v. United Airlines, Inc.*, 282 F.3d 296, 300 (4th Cir. 2002).

Applying the inquiry notice standard to the instant case, the Court finds that the statute of limitations accrued no later than July 10, 1998, when Plaintiff became aware both of the fact that he had suffered a right femoral nerve injury and that his knee surgery on June 16, 1998 was the cause of this injury. On that date, Plaintiff was treated by VA neurologist Dr. Tim Heine who informed Plaintiff that his nerve deficits were consistent with a bruised nerve resulting from either the nerve block or the tourniquet. Dr. Heine told Plaintiff that if he did not experience any improvement over the next four to eight weeks, then Plaintiff might have a permanent neuropathy. (Def.'s Ex. K-1 at 000201-02.) Plaintiff and his wife both admit that they believed by that point that a "mistake"

-5-

had been made during Plaintiff's right knee surgery.[3] (Melissa Holland Dep. at 25-28; Def.'s Ex. A-1, Tracy Holland Dep. at 92; Tr. at 54-56.) This awareness satisfies the requirements of *Kubrick* and inquiry notice. Plaintiff did not file his tort claim until April 17, 2001, more than two years after the accrual date of July 10, 1998.

However, the Court's analysis does not end here. Plaintiff asserts that even if the statute of limitations accrued shortly after his surgery in 1998, the statute of limitations was tolled until at least April 17, 1999 (two years before the claim date) because Plaintiff was undergoing a "continuous course of medical treatment" at the direction of various VA medical providers, citing, *inter alia, Otto v. Nat'l Inst. of Health*, 815 F.2d 985 (4th Cir. 1987), *Miller v. United States*, 932 F.2d 301 (4th Cir. 1991), and *Wehrman v. United States*, 830 F.2d 1480 (8th Cir. 1987).

Under the continuing treatment doctrine, as applied by the Fourth Circuit and other courts, the statute of limitations does not begin to run on an FTCA medical malpractice claim (or is "tolled"), despite the claimant's knowledge of the injury and its cause, so long as the claimant remains under the "continuous treatment" of the negligent actor for the same injury out of which the FTCA cause of action arose. *See Otto*, 815 F.2d at 988; *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1080 (2d Cir. 1988). The continuous treatment doctrine is based upon a patient's right to place trust and confidence in his medical providers, and thus, the patient is "excused from challenging the quality of care being rendered until the confidential relationship terminates." *Otto*, 815 F.2d at 988.

---

[3] At the bench trial, Plaintiff's counsel did not strongly dispute that the statute of limitations accrued during this general time period, choosing instead to argue that its application was tolled through at least April 17, 1999 due to the continuing treatment doctrine. The Court will discuss this doctrine *infra*.

-6-

The injured patient benefits "from his physician's corrective efforts without the disruption of a malpractice action." *Id.*

The Court has carefully considered the contours of the continuing treatment doctrine as it has been applied in the Fourth Circuit and elsewhere, and is constrained to find that the doctrine cannot resurrect Plaintiff's untimely FTCA claim in this case. Assuming *arguendo* that the facts of this case support application of the continuous treatment doctrine for a period of time after the June 16, 1998 surgery, Plaintiff's continuous treatment at the VA was fatally interrupted in September, 1998 when Plaintiff went outside the doctor-patient relationship and sought legal advice about his potential FTCA claim from a personal injury lawyer and proceeded to obtain second opinions from two medical specialists with no affiliation with the VA. *See Tolliver v. United States*, 831 F. Supp. 558, 560-62 (S.D.W. Va. 1993)(tolling of statute of limitations pursuant to continuing treatment doctrine ended when the plaintiff sought an outside opinion from another doctor). That Plaintiff continued to be treated at the VA following these outside consultations is insufficient. Once the continuous course of treatment has been broken, the tolling of the statute of limitations ends. *Id.* at 560 (" . . . a close nexus is required for a change of doctors not to break the chain."). Plaintiff has cited no cases where a claimant has consulted an attorney regarding his potential FTCA malpractice lawsuit, let alone sought two independent medical opinions at the urging of this attorney, yet the court nevertheless found that the continuous course of treatment remained unbroken.[4]

---

[4] The Court notes that Plaintiff's description of the holding of *Wehrman, supra,* is misleading. In that case, the plaintiff did consult with an attorney, but the consultation regarded another completely unrelated legal matter, not the plaintiff's potential FTCA medical malpractice claim against the VA. 830 F.2d at 1486. The case does not provide any support for the proposition that a plaintiff's consultation with a lawyer regarding a potential FTCA malpractice claim does not terminate the continuous course of treatment.

-7-

The Court acknowledges that enforcement of the statute of limitations in this case yields

harsh results for Plaintiff, who clearly suffered a serious injury during his right knee arthroscopic

surgery at the VA. However, as the Supreme Court has recognized:

> If there exists in the community a generally applicable standard of care with respect
> to the treatment of [the plaintiff's] ailment, we see no reason to suppose that
> competent advice would not be available to the plaintiff as to whether his treatment
> conformed to that standard. If advised that he has been wronged, he may promptly
> bring suit. If competently advised to the contrary, he may be dissuaded, as he should
> be, from pressing a baseless claim. Of course, he may be incompetently advised or
> the medical community may be divided on the crucial issue of negligence, as the
> experts proved to be on the trial of this case. But however or even whether he is
> advised, the putative malpractice plaintiff must determine within the period of
> limitations whether to sue or not, which is precisely the judgment that other tort
> claimants must make. If he fails to bring suit because he is incompetently or
> mistakenly told that he does not have a case, we discern no sound reason for visiting
> the consequences of such error on the defendant by delaying the accrual of the claim
> until the plaintiff is otherwise informed or himself determines to bring suit, even
> though more than two years have passed from the plaintiff's discovery of the relevant
> facts about injury.

*Kubrick*, 444 U.S. at 123-24. The record before the Court does not elucidate why Plaintiff did not

file his administrative claim under the FTCA during the time he consulted with attorney Morrison

or at some later time still within the two-year statutory period. However, the Court can "discern no

sound reason for visiting the consequences of such error on the [D]efendant." *Id.* Accordingly, the

Court finds that the "continuing treatment doctrine" tolled the statute of limitations in this case until

no later than September 30, 1998, and thus, that Plaintiff's administrative claim filed with the VA

on April 17, 2001 is untimely.

-8-

## Conclusions of Law

1.     The statute of limitations in this matter accrued no later than July 10, 1998, at which time Plaintiff was aware of both the fact that he had suffered a nerve injury in his right leg and the cause of his injury.

2.     Assuming that the statute of limitations was tolled for a period of time due to Plaintiff's undergoing a continuous course of medical treatment at the direction of the VA medical personnel, that tolling ended on September 30, 1998 when the continuous course of treatment was interrupted by Plaintiff's consultation with an attorney and two medical specialists who were not affiliated with the VA in any manner.

## Conclusion

For the foregoing reasons, contemporaneously with entry of this Memorandum Opinion, the Court will enter a final judgment dismissing Plaintiff's claims with prejudice.

P. Trevor Sharp, U.S. Magistrate Judge

January 22, 2004

-9-